371 So.2d 1355 (1979)
George W. GWATNEY, Raywood Baudoin, Walter Broussard, Cecil Chatman, Jr., Emile Choplin, Jr., Archie Cobb III, Jeanette Francez, Karl Girouard, Lawrence Harry, Terry Hayes, Charles E. Humbird, James M. Jacques, Raymond Jeoffroy, William S. Menard, Steve Pearson, Alton Pitre, Charles Robinson, Kenneth Short, John Tufts, Jr., Plaintiffs-Appellees,
v.
Joseph Edward MILLER, Defendant-Appellant.
No. 6959.
Court of Appeal of Louisiana, Third Circuit.
May 23, 1979.
Rehearing Denied July 11, 1979.
*1356 Seidel & Bailey, Fred K. Bailey, Lafayette, for defendant-appellant.
DeBaillon & Miller, Roderick L. Miller, Lafayette, for plaintiffs-appellees.
Before CULPEPPER, DOMENGEAUX and GUIDRY, JJ.
GUIDRY, Judge.
Plaintiffs instituted this action against the defendant, Joseph Miller, seeking to enjoin him from using a 2.935 arpent tract of land owned by him for storage of various pieces of "street fair" equipment. The 2.935 arpent tract owned by defendant forms part of a larger tract of land known as the "Oakcrest Plantation Subdivision" and is hereafter referred to as lot 26.
Plaintiffs allege that defendant's use of lot 26 for the purpose of storing this equipment is violative of a restrictive covenant which was placed on the land by the plaintiffs' and defendant's ancestors in title. Following a hearing on a rule to show cause why a preliminary injunction should not issue enjoining defendant's use of his land in said manner, the trial court determined that Mr. Miller's actions constituted a violation of the restrictive covenants to which the property was subject, and issued a preliminary injunction against him. Trial was subsequently held to determine if the preliminary injunction should be made permanent and if plaintiffs were entitled to the damages and attorney's fees prayed for. Following trial on the merits, the court issued a permanent injunction enjoining defendant from storing his street fair equipment on lot 26 and rejecting plaintiffs' demands for damages and attorney's fees. Defendant has appealed, urging that the trial court erred in its issuance of the permanent injunction. Plaintiffs have neither appealed nor answered the appeal. The substantial issues on appeal are:

*1357 I. DO THE PLAINTIFFS HAVE A RIGHT OF ACTION TO ENFORCE THE RESTRICTIVE COVENANTS SET FORTH IN THE DEED WHEREBY DEFENDANT ACQUIRED LOT 26?
II. DID JOSEPH MILLER VIOLATE THE RESTRICTIVE COVENANT PRECLUDING NON-RESIDENTIAL USE OF LOT 26?
III. HAS THE RESTRICTIVE COVENANT PRECLUDING NON-RESIDENTIAL USE ON LOT 26 BEEN ABANDONED?
I. DO THE PLAINTIFFS HAVE A RIGHT OF ACTION TO ENFORCE THE RESTRICTIVE COVENANTS SET FORTH IN THE DEED WHEREBY DEFENDANT ACQUIRED LOT 26?
The record reveals that lot 26, along with each of the lots owned by plaintiffs, originally formed part of an 82.15 acre tract of land owned by Lucien Hulin, Jr., Lewis C. Picard and Raywood J. Meyers. All the plaintiffs (with the exception of George Gwatney) purchased their lots directly from Messrs. Hulin, Picard and Meyers. Mr. Gwatney and the defendant acquired their lots from Elmer Brown, who had purchased them from the original owners. Nine restrictive covenants, identical in form and content, were incorporated into each act of sale for the lots purchased by plaintiffs. These restrictive covenants were likewise incorporated into defendant's act of sale for lot 26. Restrictive covenant number 6 which appears in each such deed reads as follows:
"The purchaser named in the Act of Sale to which this Exhibit is attached, hereby binds and obligates himself, his heirs, successors or assigns not to use or permit to be used any house or houses erected or to be erected on the property described in the said Act of Sale either directly or indirectly, for trade or business of any form or for any purpose other than that of a residential purpose."
Defendant contends that plaintiffs do not have a right of action to enforce the restrictive covenants on his property. He contends that insofar as the restrictions were not originally devised for the purpose of pursuing a general building plan or scheme for the area, they are purely personal obligations which can be enforced by the vendor-developer alone.[1] Without specifically addressing defendant's exception of no right of action, the trial court apparently found no merit to defendant's contentions. We agree.
In support of his position, appellant relies upon the following jurisprudence: Murphy v. Marino, 60 So.2d 128 (La.App. 1st Cir. 1952); Lamana-Panno-Fallo, Inc. v. Heebe, 352 So.2d 1303 (La.App. 4th Cir. 1977) and In re Congregation of St. Rita Roman Catholic Church, 130 So.2d 425 (La.App. 4th Cir. 1961). In Murphy, supra, the court stated:
"It is our understanding of the law that in order to create a binding covenant running with the land in a subdivision, and enforceable by any purchaser of property therein, there should be a uniform plan of restriction applicable to the subdivision as a whole, or to a particular part of the subdivision, known to each purchaser and thereby, by reference or implication, forming a part of his contract with the subdivider. As stated before, that situation did not exist in the case of the Steele Place Subdivision.
26 Corpus Juris Secundum, Deeds, § 167, pages 552 and 553, covers the above point as follows:

`A general building scheme may be defined as one under which a tract of land is divided into building lots, to be sold to purchasers by deeds containing uniform restrictions. * * * In determining whether land is included in a building scheme, doubts are to be resolved in favor of the free use and enjoyment of the property and against restrictions. * * * the right to enforce restrictions imposed pursuant to a *1358 general scheme must be universal or reciprocal, that is, the same restrictions must apply substantially to all lots of like character or similarly situated, and the scheme must be incorporated in all the deeds.'" at pg. 130.

In Murphy the court concluded that the restrictive covenants sought to be enforced had not been created pursuant to a general building plan or scheme, noting at the outset that the restrictions had not been uniformly imposed on the lots in the subdivision and had, in many instances, been amended or changed completely. In the instant case, however, appellant failed to produce any evidence at trial to indicate that the restrictive covenants imposed on the lots within Oakcrest Plantation Subdivision had not been uniformly imposed, or had been amended or changed by the subdivider. On the contrary, defendant's act of sale, as well as each of the plaintiffs' acts of sale reveal that the restrictive covenants for all these lots are identical.
In the case of Lamana-Panno-Fallo, Inc. v. Heebe, supra, the court found that the restrictive covenants sought to be enforced were unenforceable because they had been abandoned. In dicta, the court did state that the restrictions had not been made pursuant to a general subdivision plan, however it did not discuss the facts which formed the basis for this conclusion. Therein the court stated:
"The restrictive covenants in the title did not come into being as one overall or general plan of restrictions imposed upon the entire subdivision, but instead, restrictive stipulations were inserted in the initial title deeds from the owner and developer . . . to purchasers. . ." at pg. 1304
The fact alone that restrictive covenants are inserted into individual acts of sale does not establish that they were not intended to pursue a general plan of development for the subdivision. Rather the uniformity or consistency of the restrictions must be examined in order to determine the original intentions of the subdivider. See Yiannopoulos, Real Rights: Limits of Contractual and Testamentary Freedom, 30 La.Law Rev. 44 (1969) at p. 64.
In the case of In re Congregation of St. Rita Roman Catholic Church, supra, the court found that the covenant sought to be enforced was a purely personal obligation, stating:

"Building restrictions, such as those in question, are valid and enforceable where inserted in deeds in pursuance of a general plan devised by the ancestor in title to maintain certain building standards; such restrictions inure to the benefit of all other grantees under a general plan of development, and are real rights running with the land, which the grantees or their successors in title may enforce by injunction. Murphy v. Marino, La.App., 60 So.2d 128; Munson v. Berdon, La.App., 51 So.2d 157; Salerno v. De Lucca, 211 La. 659, 30 So.2d 678; Alfortish v. Wagner, 200 La. 198, 7 So.2d 708; Edwards v. Wiseman, 198 La. 382, 3 So.2d 661.

However, where restrictive covenants do not appear in chains of title of half the lots of a subdivision, for which no general plan of subdivision or restrictions had been recorded, as obtains here, such restrictions will not be enforced as covenants running with the land against any of the grantees of original subdivider or their successors. Herzberg v. Harrison, La.App., 102 So.2d 554. The cited case, from our First Circuit Court of Appeal (1958) contains an exhaustive and clear review of our jurisprudence establishing this principle.

Where the restriction is not a covenant running with the land, it is personal to the creator of the restriction, in this case Interstate Land Co., whose existence is unknown or unaccounted for herein. Murphy v. Marino, La.App., 60 So.2d 128." at pg. 428

In St. Rita Roman Catholic Church, the subdivider included the building and use restrictions in dispute into only 60% of his acts of sale. In the instant case, defendant has failed to produce any evidence to establish that a similar factual situation exists. We find, therefore, that the jurisprudence *1359 relied upon by appellant on this issue is not supportive of his position, and that he has failed to produce any evidence to refute the plaintiffs' contention that the area has been developed pursuant to a general building plan or scheme. In the case of Camelot Citizens Association v. Stevens, 329 So.2d 847 (La.App. 1st Cir. 1976), writ refused June 11, 1976, the court stated:

"It cannot be questioned that the owners of property in a subdivision have the right to impose building restrictions on their land in order to further a general plan of development. See Yiannopoulos, Civil Law of Property, sec. 104, page 310 (1966); Smith, Building Restrictions in Louisiana, 21 La.L.Rev. 468 (1961); Taggart, `Equitable Restrictions' in Louisiana, 33 Tul.L.Rev. 822 (1959). To ascertain the effect to be given to such building restrictions, we must first decide whether such a restraint on the use and disposition of property should be classified as a servitude, a real obligation, a covenant running with the land, or some other classification. Professor Yiannopoulos holds the opinion, and we agree with him, that due to the unique nature of building restrictions, they should be classified as `sui generis real rights akin to predial servitudes,' and they should be governed by the general rules applicable to predial servitudes, subject to any exceptions established by a special legislation or jurisprudence as to their creation, enforcement or termination. Yiannopoulos, Real Rights: Limits of Contractual and Testamentary Freedom, 30 La.L.Rev. 44, 63 (1969); also see Fitzwater v. Walker, 281 So.2d 790, 792 (La.App. 3rd Cir. 1973).

We can thus say that building restrictions, such as those in question, are valid and enforceable where inserted in deeds in pursuance of a general plan devised by the ancestor to maintain certain building standards; such restrictions inure to the benefit of all other grantees under a general plan of development and are real rights running with the land, which the grantees or their successors in title may enforce by injunction proceedings. See Salerno v. De Lucca, 211 La. 659, 30 So.2d 678, 679 (1947); Edwards v. Wiseman, 198 La. 382, 3 So.2d 661, 663 (1941); Herzberg v. Harrison, 102 So.2d 554, 555 (La.App. 1st Cir. 1958)." (Emphasis ours) at p. 849

We conclude that the building and use restrictions which were uniformly incorporated into plaintiffs' and defendant's acts of sale were devised for the purpose of maintaining a general plan of development for the area, and therefore constitute real rights which inure to the benefit of all other grantees under said plan of development. Plaintiffs, therefore, clearly have a right of action to enforce the restrictive covenants on lot 26. We find this position to be further supported by the express terms of the covenants themselves. Restrictions numbered eight and nine provide:
"8. Should any of these restrictions be violated, or should any attempt be made to violate the covenants and restrictions contained herein, any and all persons owning any property in a tract in which the property described in the Act of Sale to which this rider is attached is located are hereby granted the right and privilege to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate the said covenants or restrictions. Invalidation of any one of these covenants by judgment or court order shall in no wise affect any of the other provisions, which shall remain in full force and effect.
9. These covenants and restrictions are to run with the land and shall be binding on all parties and all persons claiming under them."
We find no merit to this assignment of error.[2]
*1360 II. DID JOSEPH MILLER VIOLATE THE RESTRICTIVE COVENANTS TO WHICH HIS LAND WAS SUBJECT?
The record reveals that Mr. Miller is in the business of operating a "street fair" for schools and churches in the Lafayette area. The equipment used for the fair, i.e., rides, concession stands, billboards, etc., is owned by Mr. Miller. The defendant also owns a number of trucks, including two tractor-trailers, which he uses to transport this equipment to and from fair sites. When defendant's fair is not "on location", he stores the trucks and the equipment on lot 26, on which is also situated the mobile home in which he and his family reside. There is no evidence that Mr. Miller has ever charged admission for entrance onto his property, or conducted the fair or operated any of the equipment for direct financial gain while it was situated on lot 26. He uses the land to store the equipment, and while it is so situated, he inspects it for mechanical problems and makes any necessary repairs or improvements to it. There is no dispute that when the defendant purchased this lot, he did so subject to several restrictive covenants. The express terms of the act of sale for lot 26 provided:
"This sale is made and accepted subject to the restrictive covenants, easements, mineral reservations and rights of way and obligations of ownership affecting the property, and particularly the restrictive covenants referred to in Exhibit A of Act 603681, which exhibit is made a part hereof by reference."
Plaintiffs allege that defendant has violated and continues to violate restrictive covenant number six which we have previously quoted.
In its written reasons for judgment granting the preliminary injunction the trial court stated:

"Plaintiffs herein contend that defendant, Miller's use of his land constitutes a violation of Provision No. 6 of the restrictive covenant found in Act No. 603681 and binding upon the defendant and plaintiffs alike. As such, plaintiffs contend that defendant Miller should be enjoined from using his property as a place to store his street fair equipment. . . .
The intent of Provision No. 6 leaves little room for reasonable minded persons to differ. The provision is clearly meant to preclude all commercial endeavors from the land affected by the covenant.
In this regard, the court finds the use of the land made by the defendant falls within the scope of the restriction intended by the grantor."
We agree. In the case of Salerno v. De Lucca, 211 La. 659, 30 So.2d 678 (1947) the court stated:

"It is well established jurisprudence of this state that where restrictions have been inserted in deeds in pursuance of a general plan devised by the ancestor in title to maintain certain building standards and uniform improvements, such as those here under consideration, they are valid and enforceable. Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641, L.R.A.1916B, 1201, Ann.Cas.1916D, 1248; Hill v. Wm. P. Ross, Inc., 166 La. 581, 117 So. 725; Rabouin v. Dutrey, 181 La. 725, 160 So. 393; and Ouachita Home Site & Realty Co. v. Collie, 189 La. 521, 179 So. 841. These are real rights or covenants that run with the land for the benefit of land owners within the area and to prevent the violation of these restrictions injunction proceedings may be resorted to. See Collie and Queensboro cases, supra, and also Edwards v. Wiseman, 198 La. 382, 3 So.2d 661.

Although these stipulations are stricti juris and every doubt should be resolved in favor of the unencumbered use of the property, whenever differences arise as to the extent or limitation of these restrictions, we must look to the intention of the party encumbering the property from the words used in the stipulations in the deed, consideration being given to the entire context of the instrument rather than to a single phrase or clause, for obviously those acquiring the property in the restricted area were motivated and *1361 influenced to purchase the same because of these limitations and they are entitled to the presumption that they will be fairly and faithfully complied with." at pp. 679-80

Applying this reasoning, the Supreme Court in Salerno, supra, determined that a restrictive covenant which provided that "`there shall be no business establishments'" on defendant's property was intended to preclude the erection of billboards thereon.
In the case of LeBlanc v. Bowen, 238 So.2d 369 (La.App. 4th Cir. 1970) a tract of land which was situated adjacent to property subject to a residential restrictive covenant sought by plaintiff to be enforced was being used by a trailer sales company for commercial purposes. On occasion the trailer sales company would partially park its trailers on defendant's property and would use a roadway on defendant's property to transport its trailers back and forth from the highway. The court determined that such activities on defendant's property were within the scope of a restrictive covenant which provided that:
"No commercial establishment, nor dairy, nor noxious or offensive establishment shall be erected or maintained thereon;
. ."
We have examined all of the building and use restrictions which apply to Mr. Miller's property and find that the clear intent of the subdividers was to maintain the lots exclusively for residential purposes. We find the appellant's contention that restriction number six governed solely the use to which "houses" on the lots were employed (and not the use to which the land itself was employed) to be untenable. To construe this restriction so as to preclude commercial activities only when such are conducted from "houses" would clearly subvert the subdividers' intention to maintain an area purely residential in character. A lot which is being used to store a "street fair"albeit immobilizedis nevertheless being employed to further a commercial enterprise. The clear import of the restrictive covenant is not simply to prevent lot owners from transacting business or exchanging money for goods or services while occupying the land, but rather to maintain the visual aesthetics of the area and to keep away the ordinary manifestations of commercial activities such as signs, trucks and nonresidential structures. The covenant precludes using the property, either directly or indirectly, ". . . for trade or business of any form OR FOR ANY PURPOSE OTHER THAN THAT OF A RESIDENTIAL PURPOSE.". The record reflects that defendant stores numerous trucks (including two tractor-trailers), a "merry-go-round", a "spook house", concession stands and various other rides, attractions and billboards on lot 26. While this equipment is so situated, he repairs, maintains and makes improvements on it. We find that such activity does not constitute a "residential purpose" within the intendment of restriction number six. We therefore agree with the trial court that the storage and/or repair of this equipment while it is located on lot 26 violates the restrictive covenant to which such lot is subject.
III. HAS THE RESTRICTIVE COVENANT PRECLUDING NONRESIDENTIAL USE OF LOT 26 BEEN ABANDONED?
The defendant contends that restriction number six, precluding non-residential use of lot 26, cannot be enforced because it has been abandoned. In support of this contention, appellant has produced several photographs allegedly depicting violations of this restriction within the subdivision. The trial court apparently found that the defendant failed to establish an abandonment of this restrictive covenant although it did not specifically address the issue in its reasons for judgment. We agree, and likewise find no merit to this assignment of error.
It is not every violation of a building restriction which will constitute its abandonment. Insubstantial, technical or infrequent violations which do not manifest an intent to subvert the original plan or scheme of development will not constitute an abandonment of the restrictions. However, when the property owners can be regarded *1362 as having abandoned the plan of development which the restrictions were intended to implement by virtue of their acquiescence to frequent and numerous violations thereof, such restrictions are considered abandoned. Edwards v. Wiseman, 198 La. 382, 3 So.2d 661 (1941). In the case of Marquess v. Bamburg, 188 So.2d 721 (La.App. 2nd Cir. 1966), the court stated:

"In determining whether the restriction has been abandoned by the property owners, it is essential to consider the number and the nature of the violations and their proximity to the objecting residents. Appropriate discussion of this question is to be found in 26 C.J.S. verbo Deeds § 169, p. 1164 and in 14 Am.Jur. § 295 § 298. These authoritative comments received the approval of the Supreme Court in Guyton v. Yancey [240 La. 794, 125 So.2d 365 (1960)], supra.

`The character, as well as the number, of claimed violations must be considered in determining whether the complaining property owners have waived or forfeited the benefit of a restriction. Where an owner has permitted or acquiesced in so many violations of the restriction, or such violation, without objecting thereto that the plan may fairly be said to have been abandoned, he cannot thereafter object to a subsequent violation; waiver has been held not to result unless there have been general and multiple violations without protest. On the other hand, if violations have not been permitted to such an extent as to evidence an abandonment of the plan, a party will not be prevented from objecting to further violations by the fact that he has not objected to previous violations by others, particularly where such violations did not immediately affect the enjoyment of his own premises, or where they were trivial, or minor, in character as compared with those complained of; and the fact that plaintiff has acquiesced in, or has not objected to, a violation committed by defendant does not estop him to prevent an additional or enlarged violation. * * *' (26 C.J.S. verbo Deeds § 169, pp. 1164-1166)." at p. 723

Whether there has been acquiescence in violations of subdivision restrictions sufficient to defeat enforcement of the restrictions depends upon the circumstances of each case, including particularly the character, materiality and number of the violations. Guyton v. Yancey, 240 La. 794, 125 So.2d 365 (1960). As a result of the alleged abandonment of the restriction in dispute a substantial change in the intended nature of the subdivision must take place. Guyton, supra; Marquess, supra; Adair v. Chrysler, 212 So.2d 552 (La.App. 2nd Cir. 1968); See also Plauche v. Albert, 42 So.2d 876 (La.App. 1st Cir. 1949); Melrose Civic Association v. Universal Builders, Inc., 289 So.2d 521 (La.App. 1st Cir. 1973), writ refused 293 So.2d 167 (La., 1974).
The record reveals that among the plaintiffs, Alton Pitre sells real estate from his home; Lawrence Harry sells shrimp from his home; William Menard sells tomato plants which are grown on his property; Raymond Jeoffroy advertises his concrete business in the yellow pages using his home telephone number; and, Jeanette Francez parks a school bus on her property when she is not driving it for a living. Assuming arguendo that each of these activities constitutes a violation of building and use restriction number six, we do not find that these few violations manifest an intention to abandon the plan of development which the restriction was originally intended to implement. The record reveals that Mr. Harry and Mr. Menard make only periodic sales to other neighbors of their goods, and do not rely on these periodic sales for a living. After examining all the evidence in the record, including photographs submitted by appellant, we are unable to find any outward manifestation of nonresidential activities taking place on these lots where the alleged violations are taking place. We do note that one property owner has a sign on his lot reading "Puppies", and that he presumably has puppies for sale on the property. However, we find that the character of these technical violations fails to establish a *1363 general intent to substantially change the intended nature of the subdivision from that of a purely residential area. We therefore find no manifest error in the trial court's determination that the evidence failed to establish an abandonment of the building restriction herein sought to be enforced.
For the above and foregoing reasons, we affirm the judgment of the trial court. All costs of these proceedings are to be paid by appellant.
AFFIRMED.
NOTES
[1] Neither Elmer Brown, defendant's immediate ancestor in title, nor any of the original owners of the 82.15 acre tract are party plaintiffs to the instant suit.
[2] The above cited jurisprudence and that referred to hereafter in this opinion has recently been codified by Acts 1977, No. 170, § 1, which repealed the former Title V of Book II of the Louisiana Civil Code, and substituted a new Title V, "Building Restrictions", containing Articles 775 to 783.